

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RENNISSE MCKINLEY | * |
| v. | * Civil No. JFM-05-1525 |
| VERIZON COMMUNICATIONS | * |

\*\*\*\*\*

MEMORANDUM

Plaintiff Rennisse McKinley, an African-American female, filed suit against defendant Verizon Maryland, Inc. alleging unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* The parties conducted discovery, and Verizon now moves for summary judgment. For the reasons that follow, the motion will be granted.

I.

Verizon hired McKinley as a consultant for its Baltimore call center on January 18, 1999. As a consultant, McKinley provided customer service over the phone.

On September 26, 2003, McKinley submitted to John Dukes, Verizon's Absence Administrator, a note from her treating physician, Dr. Romana Gopalan. The note stated that Dr. Gopalan had seen McKinley at the Security Crossroads Medical Center that same day, and that he had diagnosed her with repetitive stress injury. He recommended that she be taken "offline" for one month. Dukes accordingly relieved McKinley of her consultant duties and assigned her to light duty until October 26.

On light duty, McKinley was not required to answer customer phone calls. Instead, she performed various administrative tasks, including filing and helping to plan a health fair. Soon after her reassignment, however, her supervisors determined there were not enough suitable tasks available at the Baltimore call center to occupy McKinley fulltime. They therefore transferred her to an office in Beltsville where more work was available.

Once in Beltsville, McKinley complained that her medical condition prevented her from doing the work she was given, which consisted mostly of sorting mail. Her supervisors reminded her that the note from Dr. Gopalan stated only that she was to be taken "offline," which they interpreted to mean she could not answer phones. In response, McKinley submitted a second note from Dr. Gopalan's office on October 6 that stated she had visited the Medical Center that same day, and that reiterated she "should be offline" until October 26. The note further stated that McKinley "should not type, sort, no mouse activity, office equipment, computer work -- no repetative [sic] motions at all." (emphasis in original). The note was signed by Michelle Anderson, an employee at the Medical Center. Because these more detailed restrictions covered every task that McKinley could have performed in Beltsville, she was sent back to Baltimore. There she was again assigned discrete administrative tasks.

Dukes conducted a review of the status of medically restricted employees on October 28, during which he noticed that McKinley's restriction had expired two days prior. Upon notifying her of this, McKinley told him that the previous day she had placed in his mailbox a new note from Dr. Gopalan excusing her from work for another month. When Dukes retrieved the new note he noticed that it was all but identical to the one McKinley had submitted on October 6, right down to the misspelled "repetative" and the signature of Anderson. There were three differences, though. The

2

new note stated that McKinley had been seen at the Medical Center on October 27, and that she was to be excused from work until November 26. Additionally, the fax receipt on the note indicated that it had been sent on October 23.

Suspicious of the new note's authenticity, Dukes checked the time records from October 27 to see if McKinley had taken a leave of absence to visit the Medical Center. She had not. He then called the Medical Center and spoke directly with Anderson. She stated that neither she nor Dr. Gopalan had authorized the new note, and that McKinley's work restriction had not been extended. She then asked that Dukes fax her a copy of it, which he did. Twenty minutes later, Anderson called Dukes back and said that she believed the new note had been created by copying the original October 6 note and then altering the dates. At Dukes' request, Anderson faxed him a written statement indicating that the work restriction was invalid.

The next day, October 29, Dukes advised McKinley that a disciplinary meeting would be held later that afternoon to discuss the note. He offered her union representation, which she accepted. During the meeting, Dukes recounted his investigation and told her that he believed she had knowingly and willfully violated Verizon's Code of Business Conduct by misrepresenting her health status.

McKinley professed her innocence. She claimed that she had contacted Dr. Gopalan's office on October 23 and spoken with an employee named Megan. She had told Megan that her physiotherapist had recommended another month of light duty, and that she therefore needed another note excusing her from work. Megan placed McKinley on hold for a short while, and when she picked up the phone again she asked whether McKinley would mind if the office just faxed her a

duplicate of the previous note with the dates altered. McKinley agreed, and received the note shortly thereafter.

McKinley told Dukes that she was not privy to any discussions that occurred between Megan and other staff and/or doctors at the Medical Center, and that she simply assumed the note was valid. She did admit, however, that she had not visited the Medical Center on October 27 as the note said she had. She asked that the disciplinary meeting be recessed so that she could contact Dr. Gopalan's office to confirm her story. Dukes did not believe McKinley's story and he did not grant her request. Instead, he informed her that she was terminated from her employment effective immediately.

After leaving the Baltimore call center, McKinley proceeded directly to the Medical Center. There she secured two letters from Anderson, both verifying that an employee named Megan had indeed altered the note for McKinley. One of the letters stated that Anderson had felt pressured by Dukes to say that the note was fraudulent. Union representatives presented Dukes with both letters on October 30 and asked that he reconsider his decision. He refused, telling the representatives that he believed either the letters were forged or McKinley had convinced Anderson to change her story.

In response, McKinley filed a grievance with the union. Throughout the process, Verizon maintained that McKinley was terminated for just cause. However, the company eventually offered to rehire McKinley as an office clerical assistant but without back pay. She declined and filed a charge of discrimination with the Equal Employment Opportunity Commission claiming that Dukes, a white male, had fired her because of her race and gender. This suit followed.

II.

A.

Because McKinley presents no direct evidence of discrimination, her discriminatory discharge claim is subject to the familiar burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). She must first establish a *prima facie* case of race or gender discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for her job and her performance was satisfactory; (3) she was terminated; and (4) other employees who were not members of the protected class were retained under apparently similar circumstances. *Byrd v. The Baltimore Sun Co.*, 279 F. Supp. 2d 662, 668 (D. Md. 2003) (citing *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995)).

If McKinley succeeds on this step, the burden then shifts to Verizon to advance a legitimate, nondiscriminatory reason for the action taken. *McDonnell Douglas*, 411 U.S. at 802. Verizon's burden at this stage is not one of persuasion, but merely one of production. *Id.* If the company successfully proffers such an explanation, the burden shifts back to McKinley to show that the proffered reason is merely a pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). McKinley's mere belief that her termination was race and gender driven is insufficient to avoid judgment as a matter of law. *See Williams v. Cerberonics*, 871 F.2d 452, 456 (4th Cir. 1989).

B.

Verizon concedes that McKinley has satisfied the first three requirements of a *prima facie* case. It contests, however, her assertion that other employees at the Baltimore call center who are not black or female were retained under similar circumstances.

5

In her complaint and deposition testimony, McKinley names only one such employee, Charles Grottendick, a white male, who she claims was not fired for submitting false health information. In May 2003, Grottendick called in to work to report that he would be absent due to illness. When Dukes checked to see the area code from which Grottendick was calling he saw that it was a Chicago phone number. A few days later he visited Grottendick's home and found that he was not there. Suspecting that he had been lied to, Dukes suspended Grottendick without pay until he could determine whether Grottendick had been untruthful about his condition. When Dukes eventually learned that Grottendick had been recuperating from an illness at a friend's home, and that he had been calling into work with a calling card registered to a Chicago area code, he reinstated Grottendick.

McKinley would have been similarly situated to Grottendick if Dukes' call to Anderson at the Medical Center revealed that McKinley had indeed secured a valid extension of her medical restriction. But that is not what happened. Dukes' initial suspicion of McKinley's untruthfulness was *confirmed* by Anderson, not disavowed. Thus, the two employees are not similarly situated, and McKinley has therefore failed to establish a *prima facie* case of discrimination.

C.

Assuming *arguendo* that McKinley could make out a *prima facie* case, her claim would still fail. Verizon has provided a legitimate, nondiscriminatory reason for her termination: She submitted to Dukes a doctor's note that was a carbon copy of a note she had submitted previously, except for the dates. Time records showed that McKinley did not visit her doctor on October 27 as the note said she did. And Dukes received confirmation from the woman whose signature appeared on the note

that neither she nor Dr. Gopalan had spoken with McKinley about extending her reprieve from work, let alone altered the original note. Because misrepresenting one's health status is a violation of Verizon company policy, Dukes fired her.

McKinley has not rebutted this evidence with competent proof showing that this reason was pretextual. Her unsubstantiated contention that she and unnamed others within the Baltimore call center believed Dukes to be a racist is insufficient. *See Williams*, 871 F.2d at 456; *Byrd*, 279 F. Supp. 2d at 669. So too is her bald assertion that Dukes only investigated the origins of the note because of his racist presumption that African American females are more prone than others to submit false information to superiors. *See id.* This is particularly so in light of her reliance upon Dukes' suspension of Grottendick in attempting to establish her *prima facie* case. If it were true that Dukes only suspected non-whites and/or females of inappropriate conduct, he would not have taken action against Grottendick.

Finally, McKinley argues that Dukes' refusal, after he had fired her, to accept as valid the two letters from Anderson that purportedly exonerated her of any wrongdoing evidences his underlying racist and misogynistic motivations. Yet Dukes was under no obligation to reconsider his decision once it was made, and given that Anderson had informed him previously that McKinley had forged the note, he had reason to suspect that the new letters were forged as well. Whether he was correct in this assessment is, in the end, beside the point. *Cf. DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."). For McKinley has failed to show that his judgment was tainted by considerations of her race or gender.

For these reasons, Verizon's motion for summary judgment is granted. A separate is being entered herewith.

Date: March 22, 2006

J. Frederick Motz
United States District Judge